## WORK v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court of Appeals, Seventh Circuit. January 16, 1901.)

### No. 686.

RAILROAD—PERSONAL INJURIES—CROSSING—CONTRIBUTORY NEGLIGENCE—DUTY TO LOOK AND LISTEN.

Plaintiff, driving his team behind that of another, approached a railroad crossing consisting of three tracks, and at a place where the view was unobstructed. A train was passing, which stopped plaintiff and the team preceding him; and, after the train had passed, the flagman left the track to turn the semaphore, it being disputed whether or not he waved his flag in warning. The first team crossed the track, and plaintiff, who could not view the track, because of a canopy covering over his seat, unless he projected his head, started to follow. When his horses were stepping on the third track, the flagman ran in front, striking them with the flag, and calling to plaintiff to back them, which he refused to do, but ordered the flagman to let him off the crossing; and then, on seeing the train approaching, urged the horses forward, so that the train struck the wagon and injured plaintiff. At the time the flagman left the track the train was 1,200 feet away, and was giving loud and repeated signals. *Held*, that plaintiff could not recover, as there was no negligence on defendant's part, and plaintiff was guilty of negligence in not looking and listening.

Grosscup, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

The plaintiff in error brought suit to recover for injuries sustained from collision with a train of the defendant in error at the crossing at Kedzie avenue, in the city of Chicago, on December 23, 1896, between 3 and 3:30 p. m. That avenue is laid out practically north and south, and is situated in the northwestern part of the city, remote from any business or residence district. For some distance both north and south of the crossing the country was at the time of the accident an open prairie, treeless and houseless, with the exception of a one-story lime house east of the street and south of the roadway. The railway grounds were fenced, and a flagman was stationed at the crossing. The facts with respect to the collision were testified to by the plaintiff below and by four witnesses called by him. At the conclusion of the plaintiff's case the court directed a verdict for the defendant, upon which ruling error is assigned, and to review which the plaintiff sues out this writ of error. The facts disclosed by the evidence were these: Upon the day in question Work was traveling north on Kedzie avenue, driving a team attached to a heavy two-horse tank wagon carrying oil. The tank was of quarter-inch boiler iron, bolted down on stringers running lengthwise of the wagon. The tank was about 3 feet in diameter, 10 feet in length, and contained at the time 195 gallons of oil. Over the driver's seat there was a hood or covering, like a canopy top, fastened to the seat, and which prevented the driver from looking out to his right or left, except by projecting his head beyond the hood. Upon arriving at the crossing in question, he found that a train of empty coaches was passing the crossing quite slowly to the southeast, the railway tracks running northwesterly and southeasterly across the avenue. In front of him were two men in a wagon and leading two cows, waiting for the passing of this train. Work stopped alongside and a little to the rear, 20 feet or more, from the nearest rail. After the passage of the coach train, his view of the crossing and street immediately in front of him was unobstructed. He was 40 years of age, and had been acquainted with this crossing for 2 years, passing it daily. The crossing was occupied by three tracks of the railway company, each 10 feet apart, and each 4 feet 8 inches in width. The south track was a spur or switch track; the two northerly tracks being the main tracks of the railway, on the south one of which the train of coaches was passing southeasterly. The roadway for its whole width was planked between the tracks and between the rails. The flagman's shanty was just west of Kedzie avenue and northeast of the northerly track. Two men in a wagon coming south on Kedzie avenue had stopped north of the railway to await the passing of the train, the flagman being stationed at about the center of the avenue, and just north of the most northerly rail. Upon the passing of the coach train the flagman in the street at the north of the railway track, according to the evidence of the two men waiting in the street at the north, waived his flag to stop the approach of teams from the south, and ran to his shanty to turn the semaphore to notify a passenger train approaching from the southeast that the line was clear. The two men who were in the wagon deny that the flag was waved. One of them testifies as follows: "After the last car of the coach train had gone to the southeast, and had cleared the crossing, the first thing I saw on the north of the tracks was the flagman standing in the middle of the road with his flag. After that he turned and ran over towards the shanty, and I paid no attention to him, but started up to drive across the tracks." Work testified that he first saw the flagman at the west side of the street, at or near the curb, walking towards the shanty. As soon as the coach train passed the crossing to the southeast, those in the other wagon started to cross the tracks, and Work followed. Neither those men nor Work testified that the conduct of the flagman influenced them or him to go forward. The two men and the cattle passed the tracks in safety. Work had gotten upon the middle of the three tracks when the flagman ran back along the northerly track, waving his flag to stop Work, and when in front of Work's advancing team struck the horses in the face with the signal flag, and shouted to Work to go back. One of the horses, as Work stated, "was

rather touchy about the head, and flew back. The other did not so much. I hollered at him to let me off the crossing. He did not say anything to me, but kept slashing my horses. I looked to the west, could not see anything coming, and hollered at him the second time to let me go on. Failing to do it, I just turned, and looked out to the east, and saw the train coming. My team was then on what would be the uptrack, and I seen it was either my team or I get killed or get off the crossing. I could not back up quick enough; could get across quicker than I could get either way; and hollered at my horses right sharp. They jumped, and I got almost across, and engine struck rim of hind wagon wheel and end of tank." On cross-examination he testified that when the flagman got in front of his horses and waved his flag "their front feet were then right on the north track"; that he did not attempt to obey the flagman, but hollered to him to let him off the crossing. At this time Work, as he testified, did not know—what the flagman knew, and all the other witnesses saw—that a passenger train was approaching the crossing from the southeast on the northerly track. This train announced its approach by several sharp whistles at the overhead boulevard crossing, 1,200 feet away, and at the Chicago avenue crossing, 875 feet away, and the engine bell was being constantly sounded. It does not appear that Work, either before or after he started to cross, looked or listened for a train until during his altercation with the flagman, and then he saw the train 100 to 150 feet distant from the crossing. When the flagman left the semaphore and ran upon the track towards Work, the train was at about the overhead boulevard crossing, 1,200 feet distant, and Work's team was not then upon the northerly track, the preponderance of the evidence placing them upon the middle track at the time he was stopped by the flagman and during the altercation. Work cursed the flagman, and started his horses upon the northerly track, and was injured by collision with the coming train; the flagman being compelled to leave the track to avoid the train.

Edward Ryan Woodle, for plaintiff in error.
Charles B. Keeler, for defendant in error.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

JENKINS, Circuit Judge, after the foregoing statement of the case, delivered the opinion of the court.

Without considering the objection raised to the declaration, and assuming it to be good, the three counts charge the railway company with negligence (1) in carelessly running, managing, and controlling its locomotive engine, and neglecting to keep a competent flagman at the crossing to warn plaintiff of the approach of the train while attempting to pass over; (2) in carelessly running, managing, and controlling the engine and neglecting to ring its bell; (3) the same as the first, with the addition that the company allowed the flagman to leave the crossing, so that he did not give warning when he knew plaintiff was attempting to pass over the crossing, but allowed and invited him to drive across when the train was approaching, and prevented him from leaving the crossing by stopping his horses, so that the plaintiff was compelled to remain thereon until struck, etc. With a possible exception, it is difficult for us to find in the evidence any neglect of duty upon the part of the railway company. The crossing was in the outskirts of the city, remote from business and residences; an open prairie, treeless, and, with the exception of a solitary lime house, houseless; there was no need of gates, no strenuous necessity, as in the crowded thoroughfares of a great city, for a prompt passage. Only five travelers gathered here

during the time of the approach and passage of the two trains. It is not correct to say that under such circumstances the failure of the railway company to employ two men at the crossing—one at the semaphore and one at the crossing—was a failure in duty. So to hold would impose a degree of care wholly unwarranted by the surroundings. Nor was there negligence in the management of the train. It approached with no immoderate speed, the whistle of the engine was diligently sounded, and its bell was rung, and, when danger appeared to be imminent, the train was promptly stopped. So far as the evidence discloses, a competent flagman was stationed at the crossing, and upon this occasion, with a possible exception, to be noted, diligently discharged his duty. He was at the crossing with his flag as the coach train proceeded southeasterly, giving warning to all travelers upon the highway. Immediately upon the passing of the coach train, as became his duty, he ran to turn the semaphore, giving notice to the passenger train, then coming, of a clear track. There is possible dispute among the four witnesses for the plaintiff whether before or at the time he started for the semaphore he waved his flag and gave warning to those about to cross. A careful scrutiny of the evidence satisfies us that he gave such warning. The two witnesses who were upon the north side of the street positively so assert. The two men in front of Work deny; one, however, in a qualified way. These men were in haste to cross, and seemed to have given but little attention to their surroundings upon the passing of the coach train. Work saw and heard nothing. Possibly, in this state of the evidence, notwithstanding it was all produced by the plaintiff, the case should have been sent to the jury if the sole issue was the negligence of the company and its servants. We are satisfied, however, assuming negligence of the flagman, that the conduct of the plaintiff was the producing cause of this injury. If he had the right to assume, from the fact that the two men in front of him started to cross, that the flagman had given the proper signal to cross, still he was not absolved from the watchfulness and care imposed upon one in a place of danger. He would seem to have had no comprehension of the situation, as he was not aware of the presence of the flagman, and first saw him when the latter reached the west side of the street to turn the semaphore. Work was charged with the duty, which was constant upon him until he had safely crossed, to look and to listen. When he reached the middle track, the approaching train which caused the injury was 1,200 feet away, the shrill whistle of the engine being repeatedly sounded, and its bell being rung. It is incomprehensible that in the due and vigilant exercise of his senses in a place of danger he should not have heard these signals when every other witness heard them. He would seem to have followed mechanically the team in front of him, apparently giving no attention except to his team,—"seeing my horses did not go up on the cattle in front of me." Had he been observing, he could have seen the flagman running down the track from the semaphore, waving his flag in warning of danger; but he does not appear to have noticed him until he saw him in front of his horses waving the flag in their faces. The canopy top obscured

his vision along the tracks, and to enable him to see it was neces-sary that he should project his head beyond the obstruction. This fact imposed upon him the greater care and vigilance. Had he listened and had he looked while still upon the middle track, and in a place where he was safe from the coming train, he could have heard and seen its approach, and have avoided the injury. Beyond all this, the evidence satisfactorily discloses to us that he was on that middle track at the time the flagman confronted him with his flag endeavoring to stop the horses and calling on him to back. He had all the warning that could possibly be given him before he had gone upon the northerly track. He had only to stop, or at most to back his team slightly, and he was safe. But either willfully or in negli-gent ignorance of his surroundings he entered into altercation with the flagman who had stopped his horses, called upon the flagman to let him pass, and, upon the refusal of the flagman so to do, took time to look to the west, and, seeing no train, again demanded of the flagman that he get out of the way, and, the flagman failing to comply, looked to the east, and saw the coming train within 150 feet of him. Cursing the flagman, and demanding that he be allowed to pass, he shouted to his team, and attempted to cross in front of the train. Had he obeyed the flagman, and taken note of the warn-ing, he would have been safe. We can conceive of no excuse for his conduct. It certainly does not comport with the care which the law demands of one attempting to cross a place of danger. We perceive no failure of duty on the part of the railway company or its servants which should impose liability, unless, indeed, railway companies are to be held as guarantors of the safety of all travelers over crossings. We are satisfied that, had the case been submitted to the jury, and a verdict rendered for the plaintiff, it would have been the clear duty of the court to have set aside the verdict; and in such cases it is proper to instruct the jury to find for the defendant. Pleasants v. Fant, 22 Wall. 122, 22 L. Ed. 780; Bowditch v. City of Boston, 101 U. S. 18, 25 L. Ed. 980; Treat Mfg. Co. v. Standard Steel & Iron Co., 157 U. S. 674, 15 Sup. Ct. 718, 39 L. Ed. 853.

GROSSCUP, Circuit Judge (dissenting). I am reluctantly com-pelled to dissent from this opinion. The conduct of the plaintiff below, on the inquiry respecting contributory negligence, must be surveyed, not from the point of view of the flagman, or of the people across the track, but from the point of view of the plaintiff him-self. It was his judgment—made up through his own eyes and ears—that governed him; and, so far as contributory negligence is con-cerned, he can not be held to an exercise of judgment such as might have followed upon another environment.

What, then, was the state of things occurring that day, as they presented themselves to him? Arriving at the railroad crossing, the plaintiff in error found himself behind a wagon already stopped by the flagman. A train going into the city was seen to be the cause of the obstruction. When the train had cleared the track it continued to hide the view toward the city as far as the boulevard crossing, beyond which, an embankment intervening, no further view

was obtainable. The street was itself, so far as he could see, clear for passage, and as to danger from the direction of the city, his safety, so long as the ingoing train intervened, lay either in remaining where he was, or putting faith upon the outlook of the flagman.

At this moment the flagman left the track, and proceeded toward the shanty. The occupants of the wagon in front—though no inquiry to that effect was made of them on the trial—doubtless accepted this as a signal of safety, and started to cross. The plaintiff in error followed, and though those preceding got over in safety, was caught by an outgoing train suddenly emerging from behind the ingoing train. Had he disregarded the flagman, acting wholly upon his own outlook, he probably would have remained where he was, until the ingoing train had ceased to obstruct his view, and would thus have escaped injury. Relying undoubtedly, however, upon the flagman to make up for his own defect of outlook, he was led upon the track, and received the injury.

There is no question that a traveller on the highway, approaching a railroad crossing, must use his ears, and look in both directions. The railway is itself a signal of danger. Dependent solely upon his own senses, without aid from others, he must give full exercise to his senses. Had there been no flagman—had the plaintiff in error, by being alone, been required, without aid, to look out for himself—there would be no difference between the opinion of the majority and myself.

But in the case under review the plaintiff in error did not feel himself unaided. By ordinance of the city, a protector had been placed upon the tracks. The plaintiff in error had a right to rely—at least, so far as his own outlook was obstructed—upon the outlook of this protector. The withdrawal of the flagman, as seen by him, and the people in front of him, was notice that the track was clear, and that it was safe to cross. Railway Co. v. Schneider, 45 Ohio St. 678, 17 N. E. 321; Pennsylvania Co. v. Stegemeier, 118 Ind. 305, 20 N. E. 843; Sweeny v. Railroad Co., 10 Allen, 368. I do not apprehend that the application of this rule would be disputed if the view of the plaintiff in error cityward had been cut off by some fixed obstruction. In fact the obstruction was not fixed. It was a moving train that would give a clear view as soon as it had gone a little way toward the city. But, does this fact—that the obstruction to the view was temporary—make any real difference? Had it, by reason of its temporariness, any the less an effect upon the mind of the plaintiff in error? Would an ordinarily prudent man, accustomed to rely, where his view was obstructed, upon the outlook of the flagman, stop to think that, on this particular occasion, he could, by waiting, see for himself, and thus avoid the need of reliance upon the flagman?

At most city crossings the necessity for a prompt crossing is strenuous. A long procession of vehicles awaits the opening of the gates, or the signal of the flagman. There can be no such delay—no time for that careful surveillance, on the part of each passer,—as a country crossing admits. There is pressure from both directions on the highway, and from both directions on the railroad. A

looker-out, who has no other diversion, is an essential safeguard to the passers on the highway.

The city passer, compelled, under such circumstances, to take his cue from the flagman, falls naturally into that habit. The flagman, habitually, becomes his guide. A busy crossing, in this way, works with the precision of a machine. There is not—and, in the nature of things, cannot be—a large exercise of individual judgment. It is, in my judgment, straining the actual facts to say that a prudent man, thus accustomed to feel his way across these crossings, will, his own view cut off, stop to ask himself if the obstruction is but temporary. Will he not, more naturally, press on, as he would at the other crossings? He may, in following this habit, be dull, but the ordinance is for him, as well as for the keenly alert. It is meant for the man who, on similar occasions, is invited to trust to the flagman, as well as for the man who lets no occasion escape to trust any eyes not his own. It certainly was not designed to lead the unwary into an ambushed danger—a consequence that the conduct of this flagman visited upon the plaintiff below.

Nor can I concur that the plaintiff in error's conduct, in refusing to back his team off the track, must be regarded as negligence in law. There was considerable testimony tending to show that his horses had already reached the track on which he was afterwards struck. In this situation—with his horses entering upon the track, and the flagman seen by him, for the first time, in an attempt to stop him—his conduct is described by himself as follows: "After he" (the flagman) "hollered out I looked first to the west; then I looked to the east—my horses were just then entering on the track. That was the first time I saw the passenger train. Should judge its engine was 150 feet away, may be more; could not say, because it was just a glance I got of it. I saw the position I was in and had to get out of it. Did not look for distances. I had to go ahead. Did not use a whip; I hollered at the horses, and they jumped quick." And again, describing his decision to go ahead, and the reasons for it, he said: "Yes, I must get off the track and out of danger; going ahead was the quickest I could get out of danger."

Where a traveller, through the negligence of the railway, is placed in a situation where he must adopt a perilous alternative—or where, in the terror of an emergency, he acts imprudently, even wildly—there can be no imputation of contributory negligence. Beach, Contrib. Neg. § 40. "If," as Lord Ellenborough said, (Jones v. Boyce, 1 Starkie, 493,) "I place a man in such a situation that he must adopt a perilous alternative, I am responsible for the consequences."

The negligence of the railway company consists, primarily, in requiring the flagman to perform two inconsistent functions. He could not, in the nature of things, retire to operate the semaphore, without creating such misunderstanding as would lead on, to their peril, the passers on the highway. The root of this accident is not in the plaintiff in error's failure to exercise a high intelligence, but in the defendant in error's effort to make one man fill, simultaneously, two places at war with each other.

Judgment affirmed.